[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The parties were married on April 24, 1983, in Southington, Connecticut. The defendant's name at the time of the marriage was Sills. The parties have resided in the State of Connecticut for more than one year. There are no children born of this marriage. The parties have been a couple since high school, and dated exclusively from 1970 until their marriage in 1983.
The plaintiff is forty-three (43) years old, in good health, and has a college degree in education. He has been employed as a firefighter for the City of Waterbury for the past fifteen (15) years. He is currently a Captain. He claims high blood pressure, which may be inherited, but is currently being controled [controlled] by medication.
The defendant is forty-two (42) years old, and knew the plaintiff from 1969. She is a graduate of the University of Connecticut with a degree in animal science. She moved into his CT Page 9186 home in Waterbury at the time of the marriage. From that time, she was gainfully employed. She brought home around $350. per week and contributed funds into the marriage, and used all funds she retained for their customary expenses. Her income increased over time to the present level as described in her current funancial [financial] affidavit. She testified that her earnings were used within the marriage and the home.
The plaintiff claimed that there had been difficulties in the marriage leading up to November 4, 1993, when the defendant wife left the marital home. There had been occasions of absences by her in the month prior, for which he sought legal advice. The parties had run into each other at a bar, and when he returned home, he discovered much destroyed property. See Plaintiff's Exhibit 1, a series of photographs. The plaintiff complained further that his gold Corvette had been vandalized. On cross-examination, he conceded that he had been at a bar frequented on Thursday nights by firefighters, and that he had been dancing with another woman. He did not see his wife leave the bar, but understood that she was unhappy when he returned home to find the house in such disarray. She agreed that she had done the damage, and she testified that she was so upset and angry at him, that she did not know how long it took her to do this damage. She testified that they were both at that bar from 8:30 p.m. until close, and she testified that he humiliated her in front of family and friends.
The plaintiff testified that they had not been happy for a long period of time. He described it as a lack of closeness, and a lack of affection or communication. During the marriage, there had been discussion concerning children, and he would have liked to have a child. She became pregnant and had an abortion. He claimed in testimony that she refused to give up her job for a child "he wanted."
The plaintiff testified concerning his suspicions of his wife's behavior with his friends. He claimed that she stayed out after work and her descriptions of her whereabouts were not believed by him. On cross-examination, he testified that he went to Louisiana in September of 1993 with his softball team, and that the trip was taken only by men. He agreed that he told her that the marriage was over before he left, and that she did not want to get divorced.
The plaintiff testified that they both worked and ate out CT Page 9187 frequently. They both cooked, and the defendant did the majority of the cleaning of their home. He testified that he played softball and basketball, and frequently ate with friends at the Lakewood Social Club. He claimed that she would often refuse to accompany him, even when asked. On cross-examination, he conceded that he played a lot of softball, and worked out at the gym three nights a week when he was not so involved. He conceded that his wife never interfered with his activities or complained about his staying out after games.
He testified that the marriage broke down irretrievably because of her unwillingness to have children. He claimed that she had negative comments concerning his friends who had children and was consistently unwilling to discuss having a family. He testified that the men in his family died in their mid-fifties, and he would like to share some time with a child if he died at that age.
He testified that he had attempted to reconcile the marriage, and that his wife had gone to therapists, including a sex therapist. He felt their sexual relationship was not satisfactory to him. The defendant also claimed that she attempted to reconcile, and that it was the plaintiff who was completely unwilling to try.
On cross-examination, the defendant introduced a letter written by the plaintiff to the defendant, which claimed his unhappiness, and indicated that the cause of the breakdown was his need to find something more, something better that he was looking for. (Defendant's Exhibit 1) The plaintiff referred to his selfishness, and stated therein that no one had ever been nicer to him than the defendant. He conceded that there was nothing in that letter that referred to her decision never to have children. On redirect, he testified that he had written that letter to her after she wrote him a letter and that he did not want to mention the issue of children so as to not unduly burden or hurt her. He testified that he considered her to be "frail" and that the whole issue was hurtful because she had become pregnant before the marriage and had also aborted that pregnancy.
The assets of the parties are described on their respective financial affidavits. They are well-employed, and have assets. He claimed that he acquired title to the property upon the death of his father in 1973, and the purchase of his sister's interest CT Page 9188 shortly thereafter. The value of the property at the time of acquisition was between Fifty Thousand ($50,000.00) and Ninety Thousand ($90,000.00) Dollars. He indicated that the defendant contributed to the home expenses throughout the marriage.
He acquired the Denmark, New York property in 1979 and 1980. He used savings and a loan from his credit union. The house is approximately 200 years old, and is liveable. He claimed she refused to sleep in the house, and after work was done on it, she did share in using the house with him. He used it for recreational purposes, and testified that he always wanted to have a farm.
In 1984 or 1985, he received a Workers' Compensation award of approximately $25,000.00 and received an inheritance from an uncle, which he used to build an addition on the Waterbury property for approximately Ninety Thousand ($90,000.00) Dollars. The defendant contributed some funds, and he borrowed money from the credit union to furnish the home. She also contributed the sum of Two Hundred ($200.00) Dollars to the house bills weekly.
Their time shares were purchased in 1993 with a home equity loan. He conceeded [conceded] that the defendant contributed Fifty ($50.00) Dollars per week for the time share expenses.
The plaintiff claimed that the defendant's financial affidavit with respect to income was incorrect. He claimed that during the marriage she received additional compensation in the form of cash on a weekly basis, and was paid if she worked a Saturday or Sunday. He believes that she is currently bartending at The Hills, a restaurant in Waterbury. She testified that she worked during the holidays to earn extra money. She could not testify as to the amount of money earned during that period.
He has a pension with the City of Waterbury which, with deferred compensation, has increased in value during the marriage in the approximate amount of One Hundred, Thirteen Thousand ($113,000.00) Dollars. (See Defendant's Exhibit 2) He will receive an IRS refund in the amount of Four Thousand ($4,000.00) Dollars from his personal return for 1994.
The plaintiff testified that the defendant had debt coming into the marriage in the form of student loans and a loan for a car. He claimed that it took ten (10) years to pay off that CT Page 9189 debt. When she left the marital home, certain property was moved into her new home, for which he gave her Two Thousand ($2,000.00) Dollars to secure.
He further claimed on redirect that she had acquired a ten (10%) percent interest in the Middlebury Veterinary Hospital as an inducement for her to remain there more than ten years. He also claimed that the value of the Harley Davidson was Four Thousand ($4,000.00) Dollars. She claimed that the interest in the Middlebury Veterinary Hospital was speculative at best, and that Dr. Scribner had given that to her unsolicited, because she was so instrumental in the progress of the business.
The defendant testified that few of their assets were in joint names, and that only the Harley Davidson and her pension were in her own name. She testified that it was important to him to have title to their home, and that that was acceptable to her.
With respect to the issue of childbearing, she testified that she did not think he was interested in being a full-time husband and father, and that after their discussion, she terminated the pregnancy during the marriage. She conceded that she was already 36 when this occurred, and that she was not willing to be a single parent.
When she moved out of the marital home, she testified that she could no longer live with someone who had no interest in her. She had been told that the marriage was over prior to his trip to Louisiana, and that he stated to her that he needed more excitement and passion in his life. She conceded that her work suffered terribly and went through life not caring about anything. Even though she attempted to understand why he insisted that the marriage was over, she was unable to secure a committment from him to work with her to resolve the problem.
The plaintiff called Peter Scribner, veterinarian and owner of the Middlebury Veterinary Hospital, who employs the defendant. She has been so employed for ten or eleven years. She is paid approximately Thirty-two thousand ($32,000.00) Dollars, plus a pension with approximately Fifty-nine Thousand ($59,000.00) Dollars in current value. In addition to her salary, she was given extra money for bookkeeping, cleaning kennels, extra shifts, and the like. He testified that no one worked harder than she did, and that he did not keep the books, CT Page 9190 and that any extra pay was in the form of cash. He testified further that she would receive ten (10%) percent of the net profit of the sale of the veterinary hospital business. To date the practice has not been sold.
On cross-examination, the witness said that she is no longer as dependable, and that since 1993, she has been cutting down her hours. He testified that she has been devastated by this divorce, and that it has had a serious impact on her ability to function. The defendant agreed that she had been devastated by the divorce, but that she also cut down her hours due to her age, and voluntary decision to do so.
The defendant agreed that the plaintiff had asked her within the last two weeks to reconcile, and that he had spoken to her concerning his desire to have children. She continued to claim that he never made his desire for a family known to her. She continued to claim that during the marriage, they did not discuss children to the extent claimed by the plaintiff.
The defendant called Casey Schirmer, a friend of hers. She was present during one incident cited by the plaintiff with respect to his suspicions of her behavior with a male friend of his. She denied the incident in question.
The court has had the opportunity to review the evidence, in the form of notes of the testimony, the exhibits, and financial affidavits. The parties have submitted their claims for relief. The court finds that the marriage is irretrievably broken down, and enters a decree dissolving the marriage. The court finds that the cause of the breakdown is the plaintiff's unilateral decision that he was no longer "satisfied" in the marriage, and as he describes in his letter to his wife (Defendants' Exhibit 1) that ". . . a more reasonable person would probably be perfectly happy with you forever." The plaintiff is looking for "more". His claim that their childlessness was an issue is not compelling to the court. They lived their lives together from a young age, and her family was "the only family I have ever known," according to the plaintiff's own words. They made a decision together to abandon a pregnancy, and the defendant was justified in her concern about how involved the plaintiff would be as a parent. He has lived a rather selfish life, retaining property in his own name, and disregarding the contribution that the defendant had made to his life. CT Page 9191
The court finds that the plaintiff changed the unwritten rules of their committment to each other, of the essence of their marriage contract, by claiming that so late in life he was now interested in starting a family, which clearly would involve a serious physical and emotional change for the defendant. She had already established a life which included his needs above others, a life at work and with her extended family and friends, which took the bulk of her time. The plaintiff seemed to fantasize about being a parent, and was not really clear in his testimony that his idealized notion of what parenthood might entail by way of effort would be something he could retain a committment to. The court was not convinced that he understood the long-term complications to his life that fatherhood would bring.
Furthermore, the court does not find credible that assertion alone. He speaks of passion in his letter to her. He does not speak of children in that context. His letter is filled with his needs, and meeting, or finding his fulfillment. His letter is an ode to self-importance. "But that is me being selfish as usual." (Defendant's Exhibit 1) The plaintiff descibes [describes] in his own words why this marriage did not survive. The defendant, while acquiescing, may have enabled his selfishness, but is not to blame for it.
The court finds that the parties literally grew up together, but also grew apart. The marriage had no center. They lived parallel lives, and while the defendant would have chosen to spend more time with the plaintiff, accepted his decisions concerning how they would spend time. It was certainly understandable that she was devastated by his decision that the marriage was over.
In light of the statutory criteria, the court makes the following orders:
1. REAL ESTATE: The plaintiff shall retain title to the property at East Lakeside Boulevard in Waterbury. He shall continue to bear all of the costs incidental to his ownership of that property. He shall transfer his interest in real property in Denmark, New York to the defendant within thirty (30) days, or that property shall be transfered by operation of law. Upon transfer, she shall be responsible, and hold him harmless, from any and all cost incidental to her ownership of that property. CT Page 9192
2. TIME SHARES: The plaintiff shall retain the time share in Mexico, and the defendant shall transfer any interest she may have therein to the plaintiff, who will thereafter be fully responsible for all cost of owning and maintaining that property. The plaintiff shall transfer any and all interest he may have in the Florida time share to the defendant who shall bear all of the cost of owning and maintaining such property.
3. MOTOR VEHICLES: The defendant shall retain as her sole property one 1964 Corvette, a 1988 Suzuki Samarai, and 1986 Harley Davidson motorcycle. The plaintiff shall retain all other motor vehicles listed on his financial affidavit. The parties shall cooperate to exchange the required title documents, and registration documents to effect this order. The parties shall thereafter pay any loans outstanding on the subject vehicles, and taxes thereon.
4. STOCKS: The parties shall equally divide all stocks and bonds in their joint names.
5. BANK ACCOUNTS: The parties shall retain their respective bank accounts, free and clear of any claim from the other. Their joint credit union account shall be equally divided;
6. PENSIONS: The defendant shall retain her pension in full. The plaintiff shall transfer to the defendant by way of a Qualified Domestic Relations Order, Twenty-five Thousand ($25,000.00) Dollars. The purpose of this order is to equalize the pensions of the parties for the term of the marriage.
7. ALIMONY: The plaintiff shall pay lump sum alimony to the defendant in the amount of Fifty Thousand ($50,000.00) Dollars, payable within two years of the date of judgment. The court will retain the authority over the question of how those installments are paid. The plaintiff shall also pay the sum of One ($1.00) Dollar per year alimony for a period of three (3) years, which is modifiable if any of the orders in this judgement are not met, or if the defendant is unable to work, as certified by her attending physician. The court finds that this a long term marriage, but that the defendant has a demonstrated earning capacity, and has assets that will be able to be preserved from this judgment. Furthermore, the court believes that the essentially even distribution of the assets of the marriage will allow the defendant to be prepared for her CT Page 9193 retirement.
8. MEDICAL INSURANCE: The plaintiff shall continue to provide medical insurance for the defendant through COBRA for the statutory period so long as she does not elect another plan, or until her remarriage or cohabitation according to the statute, and he shall be responsible for the cost of such coverage.
9. DEBTS: The parties shall share the ATT and Bankamericard liabilities, which are joint liabilities, and the parties shall be responsible for all other debts on their respective affidavits and hold the other harmless therefrom.
10. ATTORNEYS FEES: The plaintiff shall pay the sum of Ten Thousand ($10,000.00) Dollars as an allowance to defend this action to counsel for the defendant. That payment shall be made within sixty (60) days of the date of judgment. The court makes this award of attorneys fees in light of the proposed orders of the plaintiff, filed with the court which the court does not find is a reasonable request for the distribution of property from a marriage of this duration.
11. NAME CHANGE: In light of the request of the defendant, the court orders that she shall henceforth be known as Marianne Sills.
Judgment shall enter consistent with this opinion.
DRANGINIS, J.